IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

TIMOTHY R. WHITE,                      )        CASE NO. 3:21-cv-762
                                       )
                    Plaintiff,         )        DISTRICT JUDGE JAMES R. KNEPP II
                                       )
            v.                         )        MAGISTRATE JUDGE
                                       )        AMANDA M. KNAPP
COMMISSIONER OF SOCIAL                 )
SECURITY ADMINISTRATION,               )
                                       )        **<u>REPORT AND RECOMMENDATION</u>**
                    Defendant.         )

Plaintiff Timothy R. White ("Plaintiff" or "Mr. White") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter

has been referred to the undersigned Magistrate Judge for a Report and Recommendation

pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be AFFIRMED.

## I.  Procedural History

On May 8, 2018, Mr. White filed an application for DIB and SSI.  (Tr. 81, 98.)  He

alleged a disability onset date of March 27, 2017.  (Tr. 82, 99.)  He alleged disability due to back

injury, depression, carpal tunnel, tennis elbow, PTSD, and arthritis.  (*Id.*)  Mr. White's

application was denied at the initial level (Tr. 115-16) and upon reconsideration (Tr. 149-50),

and he requested a hearing (Tr. 173-74).  On February 19, 2020, a hearing was held before an

Administrative Law Judge ("ALJ").  (Tr. 48.)

On February 28, 2020, the ALJ issued a decision finding that Mr. White had not been

under a disability within the meaning of the Social Security Act from March 27, 2017 through

the date of the decision.  (Tr. 40-41.)  On November 12, 2020, the Appeals Council denied Mr.

White's request for review, making the ALJ's decision the final decision of the Commissioner.

(Tr. 7-9.)  On April 9, 2021, Mr. White filed a Complaint challenging the Commissioner's final

decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 12, 13.)

## II. Evidence

### A.      Personal, Educational, and Vocational Evidence

Mr. White was born in 1980 and was 36 years old on the alleged disability onset date,

making him a younger individual under Social Security Administration ("SSA" regulations at all

relevant times.  (Tr. 39.)  He had at least a high school education and was able to communicate in

English.  (*Id*.) Mr. White had not worked since March 27, 2017, the alleged onset date.  (Tr. 21.)

### B.      Medical Evidence

Although the ALJ identified severe physical impairments (Tr. 22), Mr. White's challenge

in this case relates specifically to the ALJ's evaluation of evidence relating to his mental

impairments and evidence from physician Marc James Comianos, D.O.  (ECF Doc. 12 p. 15-17.)

The evidence summarized herein is accordingly focused on Mr. White's mental impairments and

the treatment records provided by Dr. Comianos.

#### 1.      Relevant Treatment History

On March 27, 2017, Mr. White sought care for low back pain at the Marion General

Hospital Emergency Department ("ED").  (Tr. 325.)  Examination notes show lumbar back

2

tenderness, and otherwise normal results, including normal mood and affect.  (Tr. 328.)   Mr. White was provided Kenalog and Norflex and discharged with a prescription for Zofran and Flexeril.  (Tr. 329-30.)

The next day, Mr. White followed up with his primary care physician, Dr. Comianos. (Tr. 444.)  He reported gastrointestinal stress and back pain, and requested time off work because of his "back and belly pain."  (Tr. 447-48.)  On examination, Dr. Comianos noted "some back issues have been chronic there," but otherwise normal findings, including normal mood, affect, and behavior.  (Tr. 447.)  Dr. Comianos diagnosed herniated lumbar intervertebral disc and acute superficial gastritis without hemorrhage, and provided a work excuse.  (Tr. 448.)  Mr. White declined any additional medications.  (*Id*.)

On April 2, 2017 Mr. White sought care for anxiety and nausea at the Marion General Hospital ED.  (Tr. 331.)   Examination findings were normal, including normal mood and affect. (Tr. 333.)  Melissa Makesa, M.D. noted his reported symptoms "seem[ed] more like irritable bowel [disorder] with increased stress," and provided a liter of IV fluids, Zofran, and Atarex before discharging him.  (Tr. 335.)

On April 12, 2017, Mr. White saw Dr. Comianos for a follow up from the ED visit.  (Tr. 457.)  He reported agitation, nervousness, and anxiety.  (Tr. 460.)  On examination, Dr. Comianos noted normal findings, including normal mood, affect, and behavior.  (Tr. 460.)  Dr. Comianos diagnosed GERD with esophagitis, blood in the stool, anxiety, and herniated lumbar intervertebral disc, and referred Mr. White to psychiatry to reestablish care.  (Tr. 461.)  Dr. Comianos wrote: "We will continue the work excuse as noted right now as I do not think he is able to work due to his underlying health issues and health problems at this time." (*Id*.)

On July 27, 2017, Mr. White attended an initial psychiatric assessment with Lalith K. Misra, D.O., Ph.D. (Tr. 467.)  He presented as "very guarded," and did not provide a medical history.  (*Id*.)  For example, he did not initially inform Dr. Misra that he had previously been seen by a nurse practitioner who started him on Wellbutrin, with which "[h]e ha[d] apparently not been compliant."  (*Id*.)  Mr. White reported being given Vistaril in the ED, which helped his blood pressure but "ran [him] down a little."  (*Id*.)  Dr. Misra agreed to renew the prescription for Vistaril at a higher dose, but declined Mr. White's request for benzodiazepine.  (Tr. 468.)  On mental status examination, Mr. White displayed a disheveled appearance, minimal engagement, involuntary movements, pressured speech, circumstantial thoughts, tangential thoughts, flight of ideas, loose associations, constricted mood, blunted and irritable affect, poor insight, limited judgment, intact memory, impaired attention, impaired concentration, difficulty with word finding, and a poor fund of knowledge.  (Tr. 469.)  Dr. Misra diagnosed bipolar disorder, depressed, and generalized anxiety disorder ("GAD").  (*Id*.)  She continued him on Wellbutrin and prescribed Seroquel and Vistaril.  (Tr. 470.)

Mr. White returned to Dr. Misra for a psychiatry follow up on August 14, 2017.  (Tr. 476.)  Dr. Misra noted he remained "guarded" and "reported over and over that his anxiety [was] very high."  (*Id*.)  He said Vistaril was not helping and "was trying to get a benzodiazepine." (*Id*.)  Dr. Misra told him benzodiazepine would not be good in combination with his Percocet. (*Id*.)  As to Seroquel, Mr. White reported stopping that medication after two days.  (*Id*.)  He explained: "I do not like any medicines, and if I take medicine then there should be a benefit from it."  (*Id*.)  He stated that another doctor was prescribing his Wellbutrin, but that he wanted to continue seeing Dr. Misra as well because the other doctor's nurse practitioner was bossy, rude, and did not answer questions.  (*Id*.)  Dr. Misra informed him that Vistaril "is good for

him," and that he would benefit from non-pharmacological management of anxiety not involving addictive substances like benzodiazepine. (*Id.*) She also suggested Trazodone for sleep, which Mr. White agreed to try after some initial reluctance. (*Id.*) On mental status examination, Mr. White had a disheveled and unkempt appearance, defensive behavior, involuntary movements, pressured speech, circumstantial thoughts, flight of ideas, disorganized and rambling associations, perseveration, depressed and anxious mood, blunted affect, impaired insight, limited judgment, impaired memory, impaired attention, impaired concentration, difficulty with word finding, and a limited fund of knowledge. (Tr. 478-79.) Dr. Misra diagnosed bipolar disorder, mixed, and GAD, and prescribed Vistaril and Trazadone. (Tr. 476-77.)

Mr. White returned Dr. Misra for a psychiatry follow up two months later, on October 16, 2017. (Tr. 491.) He complained of worsening back pain, treated with pain medication and a TENS unit. (*Id.*) He also wanted to do water exercises and use the steam bath and sauna at the Y. (*Id.*) He was on Wellbutrin, Vistaril, and Trazodone, but reported having Wellbutrin and Vistaril prescribed by another doctor most recently. (*Id.*) Dr. Misra noted he may not need to see her if another doctor was prescribing his medication, but he said he would rather see her because she interacted with him and answered his questions. (*Id.*) He complained of low energy, anhedonia, poor sleep, mood impacted by pain, racing thoughts, irritability, and feeling tense and edgy. (*Id*.) Dr. Misra diagnosed mood disorder, not otherwise specified, with mostly depressive symptoms, and generalized anxiety disorder. (*Id*.) On examination, he was disheveled and defensive, experienced involuntary movements and rigidity, and demonstrated pressured speech, circumstantial thoughts, flight of ideas, racing thoughts, depressed and anxious mood, blunted affect, impaired insight, limited judgment, impaired recent memory, impaired

attention, impaired concentration, difficulty word finding, and limited fund of knowledge.  (Tr. 493, 495.)  Dr. Misra continued his Trazodone and provided psychotherapy.  (Tr. 491-92.)

Mr. White returned to Dr. Misra for a psychiatry follow up two weeks later, on December 14, 2017.  (Tr. 507.)  He was agitated and incoherent, with labile to flat effect, and speech that was "slow, halting and almost mumbling in character."  (*Id.*)  He reported anger and wanting to hurt people because of problems involving his employer, who reportedly threatened and fired him and another witness.  (*Id.*)  He told Dr. Misra that he saw her and another doctor "for the same thing," but that he did not want to see the other doctor because he "just gives me Wellbutrin."  (*Id.*)  Dr. Misra informed him that she could prescribe medicines, but he needed counseling.  (*Id.*)  When she asked Mr. White about drugs, he stated he "always prefers marijuana to pain medications," and Dr. Misra believed "he may be using marijuana."  (*Id.*)  On examination, he had a disheveled and unkempt appearance, defensive behavior, psychomotor retardation and involuntary movements, pressured speech, poor/incoherent thoughts, loose associations, somatic preoccupations, depressed and anxious mood, anxious and blunted affect, impaired insight, limited judgment, intact memory, impaired attention, impaired concentration, difficulty with word finding, and limited fund of knowledge.  (Tr. 510-11.)  Dr. Misra diagnosed bipolar disorder, mixed, in an apparent hypomanic phase, and generalized anxiety disorder.  (Tr. 508.)  He was on Wellbutrin from another psychiatrist, but not mood stabilizers.  (*Id.*)  Dr. Misra recommended mood stabilizers, but Mr. White was "not interested in a mood stabilizer."  (*Id.*)  He was receptive to counseling.  (*Id.*)  She continued his Trazodone.  (Tr. 508.)

Mr. White returned to Dr. Misra two months later, on February 14, 2018. (Tr. 524.)  Her notes reflect that she had received "multiple calls from [Mr. White's] Workers Comp person," who wanted her to sign off that he was ready to go back to rehab and work.  (Tr. 524.)  She "did

not want to sign the paper" given his agitated and incoherent behavior in December and his report that another doctor was his psychiatrist for workers compensation.  (*Id.*)  She first wanted to evaluate him for impulsive behavior and ensure his medications were working and did not need modifications.  (*Id.*)  Mr. White told her he needed the paper signed so he could attend an occupational therapy evaluation on February 27, 2018.  (*Id.*)  He assured her his only thoughts of hurting others related to his former employer, and that "he would take vengeance, but it would be totally legal" and he would "not physically hurt anybody."  (Tr. 524-25.)  Dr. Misra diagnosed major depressive disorder with very unstable mood, noting he had racing thoughts and paranoia. (Tr. 525.)  She continued his Wellbutrin, Vistaril, and Trazodone after he reported Wellbutrin and Vistaril were helping and that he took Trazadone as needed.  (*Id*.)  She added Risperdal to help with anger, paranoia, and other psychotic features.  (*Id*.)  On examination, Mr. White had a disheveled appearance, defensive behavior, involuntary movements, pressured speech, thought derailment and flight of ideas, informative/relevant/rambling/racing thoughts, depressed and anxious mood, blunted and irritable affect, impaired insight, limited judgment, impaired recent memory, impaired attention, impaired concentration, limited fund of knowledge, and difficulty with word finding. (Tr. 527-28.)  Based on Mr. White's assurances that he would not harm anyone, Dr. Misra signed the requested return-to-work paperwork.  (Tr. 525.)

Mr. White established care with therapist Michael Witzky, LICW-S on March 2, 2018. (Tr. 556.)  He talked about his injuries and unfair treatment by his former employer, complaining of anger but reporting Vistaril was helping him to calm himself down.  (*Id.*)  At his next visit on March 12, 2018, Mr. Witzky observed he was preoccupied with his legal case against his employer, with circular and paranoid thinking.  (Tr. 557.)  On March 26, 2018, he reported continued pain, depression, and frustration, but was getting some pain relief after doing leg

exercises and using the hot tub and sauna at the YMCA two days per week.  (Tr. 558.)  He reported he was in career counseling, where they were trying to find a potential job that would meet the requirements of his physical limitations.  (*Id.*)  On April 11, 2018, he complained of continuing pain but was making baby steps toward rehabilitation and continued to go to the Y two days per week.  (Tr. 558-59.)

Mr. White returned to Dr. Misra for psychiatric treatment on April 17, 2018.  (Tr. 541.) Dr. Misra noted he was using a cane to walk and reported a lot of pain, which he attributed to the sudden change to cold weather.  (*Id.*)  He reported that he had stopped taking Wellbutrin, hydroxyzine (Vistaril), and Risperdal, and felt he was doing well without them.  (*Id.*)  He had only taken Risperdal for two to three days, stopped Wellbutrin three weeks prior, and had not taken Vistaril.  (*Id.*)  Dr. Misra noted Mr. White's depression seemed slightly better as he was relatively relaxed, smiled, and did not threaten or talk about anger against any particular person. (*Id.*)  She diagnosed depressive disorder and stated: "Patient does not want to take any medication now."  (*Id.*)  She encouraged that approach, but suggested he reconsider taking medication if he became impulsive and angry.  (*Id.*)  On examination, she continued to note a disheveled appearance, defensive behavior, involuntary movements, pressured speech, circumstantial thoughts, flight of ideas, restricted and repetitive thoughts, perseveration, anxious mood, anxious/blunted/labile affect, impaired insight, limited judgment, impaired attention, impaired concentration, word finding difficulty, and limited fund of knowledge.  (Tr. 543.)

Mr. White attended therapy with Mr. Witzky on April 23, 2018, where he reported that his depression and bipolar symptoms had stabilized, and that Dr. Misra "took him off all of his medications."  (Tr. 559.)  He reported that he "was not taking them anyway and [wa]s relying on

other over the counter herbal remedies." (*Id.*)  He asked to continue seeing Mr. Witzky every other week.  (*Id.*)

At therapy on May 7, 2018, Mr. White reported feeling depressed and hopeless, but was doing things to get him out of the house, like walking his dog and fishing.  (Tr. 560.)  He had stopped taking his psychiatric medications and career counseling had ended.  (*Id.*)  Mr. Witzky asked if career counseling ended because "they felt that he really did not want to work," and Mr. White answered that he "just did not like the jobs that they were offering."  (*Id.*)  Mr. Witzky felt Mr. White "may not really want to work."  (*Id.*)  On May 21, 2018, Mr. White reported he was about the same, trying to get out of the house as much as possible and using the hot tub and sauna at the YMCA to help his back pain.  (Tr. 572-73.)  On June 4, 2018, Mr. Witzky observed that Mr. White did not get "over anxious" about his car being totaled by another driver, and was "handling his anxiety better now than he has before."  (Tr. 573.)  Because Mr. White was "fairly stable," they agreed to continue therapy every three weeks, instead of bi-weekly.  (*Id.*)

On June 18, 2018, Mr. White returned to Dr. Misra for a psychiatric follow up.  (Tr. 578.)  Dr. Misra noted Mr. White was using a cane to walk, had an unstable gait, and "had severe neurovegetative signs of depression."  (*Id.*)  On examination, he had a disheveled and unkempt appearance, minimal engagement, involuntary movements, fidgetiness, restlessness, pressured speech, circumstantial thoughts, flight of ideas, disorganized/over-inclusive/racing thoughts, depressed and anxious mood, blunted affect, impaired insight, limited judgment, impaired recent memory, easy distraction, impaired concentration, word finding difficulty, and limited fund of knowledge. (Tr. 581.)  She diagnosed depressive disorder, noting he appeared "severely depressed" with symptoms effecting "his cognition and also behavior."  (Tr. 578.)  Mr. White reported that his EEOC hearing had not gone well and he had not received any pain medications

9

for a long time.  (*Id.*)  He complained of getting very angry and sometimes not being able to control it.  (*Id.*)  He was not taking any medication other than pain medication and said: "I think I should be back on the medicine."  (*Id.*)  Dr. Misra prescribed Depakote to help with anger and restarted Wellbutrin.  (*Id.*)  She noted the importance of taking medications regularly, and said it would not help to take medication for a while but not be adherent.  (Tr. 578-79.)

At his next therapy appointment on June 25, 2018, Mr. White reported he had restarted Wellbutrin and wanted to return to therapy every two weeks.  (Tr. 574-75.)  He had only been back on medications for three days, and had not yet seen much effect.  (Tr. 574.)  He reported that nothing came from the meeting with "EOC," and was trying to keep active but sometimes got discouraged.  (*Id.*)  Two weeks later, on July 9, 2018, Mr. White reported that his EEOC appeal was denied.  (Tr. 575.)  He said he would continue to seek social security disability and to work "with a group that is trying to do rehab with him so that he could work in some type of employment."  (*Id.*)  Mr. Witzky noted that Mr. White had "a fairly ingrained negative perspective," and informed him that he was "not able to do anything else for him at this time." (*Id.*)  They agreed Mr. White would see Mr. Witzky every two months going forward.  (*Id.*)

On August 15, 2018, Mr. White returned to Dr. Misra for psychiatric care, complaining of ongoing struggles with pain that increased his depression.  (Tr. 843.)  He looked tired, was using a cane to walk, and had trouble balancing himself, with apparent psychomotor retardation and constricted affect.  (*Id.*)  He reported taking pain medications, using a TENS unit, and going to the Y to do stretches and go in the sauna and pool.  (*Id.*)  On examination, Dr. Misra noted a disheveled appearance, defensive behavior, involuntary movements, pressured speech, circumstantial and over-inclusive thoughts, flight of ideas, anxious mood, blunted affect, impaired insight, limited judgment, impaired recent memory, easy distraction, fluctuating

concentration, impaired language, and limited fund of knowledge.  (Tr. 846.)  She recommended

increasing the dosage of Wellbutrin to address continued depression, but noted Mr. White did

"not look keen on it" and did not pursue it.  (Tr. 843.)  She recommended increasing his

Wellbutrin dose if his depression got worse.  (Tr. 843-44.)  He reported Depakote was helping to

mellow him out and prevent temper outbursts, and also helped with his headache.  (Tr. 844.)  Dr.

Misra continued to diagnose depressive disorder, noting he seemed "moderate to severely

depressed," with the severity worse since his last visit.  (*Id.*)

On August 20, 2018, Mr. White returned to Mr. Witzky for therapy.  (Tr. 594.)  Mr.

Witzky noted "he seems to be doing well" and was pursuing workers' compensation and social

security disability.  (*Id.*)  Mr. White reported "still going to the Y three days a week swimming

and in the sauna" and "talked about wanting to start some weight training."  (*Id.*)  He reported

keeping positive as best he could while caring for his father, who had AFib and COPD.  (*Id*.)  He

felt stable and "wonders if he needs to continue to be on medication."  (*Id.*)  Mr. Witzky advised

him to raise that issue with Dr. Misra, and to return for therapy in two months.  (*Id.*)

Mr. White returned to Dr. Misra two months later, on October 15, 2018, presenting as

"disheveled" and "lost in his thoughts" with "some processing delay in information."  (Tr. 833.)

On examination, he had a disheveled and unkempt appearance, defensive behavior, involuntary

movements, twitching and restlessness, pressured speech, circumstantial thoughts, loose

associations, a depressed and anxious mood, blunted affect, impaired insight, limited judgment,

impaired recent memory, easy distraction, fluctuating concentration, impaired language, and

limited fund of knowledge.  (Tr. 836.)  He reported being sent for psychological testing as part of

his SSI application, and said he would also start with a different counselor.  (Tr. 833.)  He

reported his mood was up and down, his energy was low, he was not able to get motivated, and

his anger was "still there." (*Id.*)  Nevertheless, he reported "[t]he medicines are working" but "[i]t is just the stress from everything." (*Id.*)  When asked if Depakote made a difference, he said it did, that his rages were less and that he was angry but aware of the consequences of his rage. (*Id.*)  Dr. Misra continued to diagnose depressive disorder, indicating that his depression "seems to have increased," with low energy and motivation and increasing irritability. (Tr. 834.)  She continued to prescribe Wellbutrin, Depakote, and Trazodone, but ordered blood testing in anticipation of potentially adjusting the dosage for his Depakote. (*Id.*)  Mr. White obtained refills of his Wellbutrin and Depakote in December 2018 and January 2019. (Tr. 825, 828.)

On February 5, 2019, Mr. White saw psychiatrist Patricia Newton, M.D. for a routine follow-up visit. (Tr. 820.)  He reported feeling well and stable on his current medications, and that therapy was helping him to cope with depression and anxiety. (*Id.*)  He was not taking Depakote regularly and was not having anger issues, so he and Dr. Newton agreed to a trial off Depakote. (*Id.*)  On examination, he was casually dressed, pleasant and cooperative, with no psychomotor abnormalities, speech within normal limits, logical and goal directed thoughts, intact associations, stable and positive mood, full affect, intact insight, good judgment, recent intact memory, intact attention, concentration and fund of knowledge, and language within normal limits. (Tr. 822.)  Dr. Newton diagnosed depressive disorder secondary to general medical condition, and noted he was "[s]table for some time on current medications." (*Id.*)  She continued Wellbutrin, hydroxyzine and trazodone, and discontinued Depakote. (*Id.*)  She advised him to return in four weeks. (*Id.*)  Thereafter, Mr. White obtained refills of Wellbutrin and Trazodone in March and May 2019, with notes indicating his next psychiatric office visit was yet to be scheduled. (Tr. 817.)

Mr. White saw Ryan Borchers, LPCC for counseling on March 21, 2019 in connection with his workers' compensation claim.  (Tr. 762.)  He was scheduled for twelve counseling sessions between March 7, 2019 and September 7, 2019.  (*Id*.)  Mr. Borchers observed he was keeping adequate hygiene and self-care, had ongoing gains in the ability to participate in physical therapy, and showed slight improvements in meeting housework needs.  (*Id.*)  His functional status was rated as mild to moderate in activities of daily living and social functioning, and moderate in concentration, persistence, pace, and adaptation.  (*Id.*)

Mr. White returned to Mr. Borchers for counseling on May 23, 2019, reporting that he was regaining strength through physical therapy and was maintaining gains in efforts to remain more proactive in meeting daily needs such as hygiene, self-care, and housework.  (Tr. 764.)  He reported continuing symptomatology but was "having more good days than bad days."  (*Id*.)  His functional status continued to be rated in the mild to moderate range for all categories. (*Id*.)  Mr. White saw John Shuman, Psy.D. for counseling on June 7, 2019, and reported no impairment in activities of daily living, social functioning, concentration, persistence, pace, or adaptation.  (Tr. 766.)  Based on a review of treatment records, Dr. Shuman opined that he had mild limitations the four functional categories.  (*Id.*)

Mr. White returned to Mr. Borchers for additional counseling visits on July 11, August 1, August 15, and August 29, 2019, where he reported maintaining improvements in hygiene, self-care, and housework needs, seeking out enjoyable activities, improved energy, some visits into the community, but some continued symptomatology.  (Tr. 768, 770, 772, 774.)  Mr. Borchers continued to rate his functional status in the mild to moderate range for all functional categories. (*Id*.)  Beginning on August 1, 2019, Mr. White reported engaging in vocational rehab.  (Tr. 770.)

On August 23, 2019, Mr. White saw Shyarnala Bheemisetty, M.D. for a follow up psychiatric visit. (Tr. 804.)  Dr. Bheemisetty noted he was "stable on current medications," found therapy "very helpful," and was "in the process of job trials" and believed his depression was "related to [the] current situation."  (*Id*.)  His diagnoses were mood disorder, mild episode of recurrent major depressive disorder, GAD, and depressive disorder.  (Tr. 805.)  Mr. White reported that he started having anxiety when he lost his job a few years prior, and used to feel down, with decreased motivation, low energy, and feeling hopeless.  (Tr. 806.)  He reported currently being on workers' compensation and in career counseling.  (*Id.*)  While he had "been doing okay for most part," he reported he would feel more stable once he got a job.  (*Id.*)  He reported helping his grandfather at home, enjoying spending time with his nieces and nephews, sleeping fairly well, and not having anger outbursts.  (*Id.*)  He reported Vistaril helped with anxiety, but he was unable to get it filled for the past few months because workers' comp would not approve it, and was using an over the counter "stress pill" instead.  (*Id.*)  On examination, he walked with a cane, displayed a casual appearance, calm and cooperative behavior, logical and goal directed thought process, intact associations, "okay" mood, congruent and restricted affect, intact memory, fair insight, adequate attention and concentration, fair judgment, intact language and average fund of knowledge.  (Tr. 808.)  Dr. Bheemisetty continued his Wellbutrin, hydroxyzine (Atarax), and Trazodone, and advised him to return in two months.  (Tr. 805.)

Mr. White saw Dr. Shuman for counseling on September 13, 2019, with a plan to engage in nine therapy sessions between September 2019 and March 2020.  (Tr. 776.)  He reported no impairments and Dr. Shuman found no limitations in mental functioning.  (*Id*.)  On September 26, 2019, Mr. White attended counseling with Mr. Borchers.  (Tr. 778.)  Mr. Borchers observed that he was an active participant in vocational rehabilitation, was keeping good hygiene and self-

14

care, and was able to spend time at a local technical college to complete testing with increased

comfort levels.  (*Id.*)  His functional status continued to be rated as mild to medium in all

functional categories.  (*Id.*)  Mr. White attended further counseling visits with Mr. Borchers on

October 31 and November 25, 2019, where his functional status continued to be rated as mild to

medium in all functional categories.  (Tr. 780, 782.)  On October 31, he expressed excitement

about being accepted into a training program at a technical college.  (Tr. 780.)  On November 25,

he was using new skills and adjusting his daily goals to meet the expectations of the new training

program.  (Tr. 782.)  He was using a cane at times as the days wound down, for stability.  (*Id.*)

On January 2, 2020, Mr. White attended a psychiatric follow up with Dr. Bheemisetty.

(Tr. 791.)  He reported he was doing well and had recently joined an IT school in Columbus, and

was enjoying the classes.  (Tr. 793.)  He reported no anger outbursts, sleeping well, taking

Vistaril twice per week as needed, but having some trouble focusing.  (*Id.*)  Dr. Bheemisetty

noted he "seem[ed] to be stable on current medications" and was finding therapy very helpful.

(Tr. 791.)  He agreed to try a higher dosage of Wellbutrin to address his trouble focusing.  (*Id.*)

He was diagnosed with moderate episode of recurrent major depressive disorder, GAD, and

depressive disorder.  (Tr. 792.)  Dr. Bheemisetty increased his Wellbutrin dose, continued his

Atarax and Trazodone, and advised him to return in two months.  (*Id.*)

## 2. Opinion Evidence

### i. Physical Consultative Examination

On July 28, 2018, Mr. White underwent a consultative physical examination with Abdul

Malik Qavi, D.O. of Olympia Health Management, LLC.  (Tr. 561.)  On examination, Mr. White

had a normal reciprocal gait pattern without an assistive device, no balance problems, a normal

sensory examination, negative straight leg testing, normal tandem walking, was able to walk on

heels and toes, and could rise, squat, and ambulate to get on and off the examination table, but "appeared very uncomfortable." (Tr. 564.) His reflexes were symmetric, hand eye coordination was good, and he was able to lift, handle and carry light objects, and could dress and undress adequately well. (*Id.*) He was cooperative, alert, and had appropriate eye contact, speech, mood, memory, and concentration. (Tr. 563-64.) A lumbar x-ray taken during the office visit revealed mild degenerative changes with no obvious fractures. (Tr. 565.) In assessing Mr. White's back pain, Dr. Qavi noted "mild to moderate limitations … during the physical examination," and observed that Mr. White "also appeared significantly uncomfortable with ambulation and with muscle testing but was able to complete all tasks." (Tr. 565.) He opined that Mr. White could walk for 30 minutes, sit for 20 minutes, stand for 30 minutes, and lift 15 pounds. (*Id.*)

### ii.    Opinions of Plaintiff's Medical Providers

On April 16, 2019, psychiatrist Raymond Richetta, M.D. completed a Physician's Report of Work Ability form for the Ohio Bureau of Workers' Compensation. (Tr. 785-86.) Prior to the date of the report, Dr. Richetta reported he had last treated Mr. White on September 21, 2018. (Tr. 785.) Using the workers' compensation form, he opined that Mr. White had "temporary" restrictions from September 6, 2018 to July 16, 2019 which prevented him from returning to the full duties of the job he held on the date of his injury. (*Id.*) In describing Mr. White's limitations, he stated Mr. White was "psychologically unable to return to work due to depression, reduced motivation, reduced concentration, insomnia, and reduced energy." (*Id.*)

On January 20, 2020, counselor Ryan Borchers, LPCC completed a Mental Impairment Questionnaire co-signed by psychologist Josh Shuman, Psy.D. (Tr. 862-66.) Mr. Borchers and Dr. Shuman noted that they treated Mr. White for depressive disorder twice per month (Tr. 762), and jointly opined Mr. White had no, mild, or moderate limitations in most specified areas of

mental functioning.  (Tr. 863-65.)  However, they opined Mr. White would be markedly limited in the ability to work a full day without needing more than the allotted number or length of rest periods.  (Tr. 864.)  They did not offer an opinion as to Mr. White's level of functioning in the four categories of mental functioning.  (Tr. 865.)  They checked a box stating "changes or increased demands lead to exacerbation of symptoms or deterioration in functioning," and also opined Mr. White would likely be absent two days per month due to mental health.  (*Id*.)  In describing why Mr. White would have difficulty working at a regular job on a sustained basis, they wrote: "Intrusive (pain driven) thoughts have tendency to interrupt functioning levels. Some struggles at times with irritability (related to abilities) leading to withdrawal / shut down behaviors."  (Tr. 866.)

### iii.    State Agency Reviewers

On August 1, 2018, state agency reviewing physician Stephen Sutherland, M.D. reviewed the record and opined that Mr. White was limited to: lift or carry twenty pounds occasionally and ten pounds frequently; stand, walk and sit six hours in an eight-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes and scaffolds; and frequently stoop, kneel, crouch, and crawl.  (Tr. 91-92.)  On October 22, 2018, state agency reviewing physician Maureen Gallagher, D.O. reviewed the record and affirmed these findings.  (Tr. 142-43.)

On June 18, 2018, state agency reviewing psychologist Erika Gilyot-Montgomery, Psy.D. reviewed the record and opined Mr. White: was capable of simple unskilled tasks, with occasional difficulty sustaining concentration, persistence, and pace; and would do best with in a work setting where the pace was not fast, where interactions with the general public and others in the work setting were brief and superficial, and where there were only occasional changes, clear

expectations, and routine tasks.  (Tr. 93-94.)  On November 9, 2018, state agency reviewing

psychologist Irma Johnston, Psy.D. reviewed the record and affirmed the same.  (Tr. 144-45.)

### C.  Hearing Testimony

#### 1.  Plaintiff's Testimony

At the February 19, 2020 hearing, Mr. White testified that he stopped working due to a

flare up in his back.  (Tr. 52.)  His prior work was very physical.  (Tr. 57.)  He was fired after he

was unable to do that work for more than six months.  (Tr. 52.)  Cold weather, bending, twisting,

and stooping made his back pain worse.  (Tr. 54-55.)  He also had anxiety and depression, which

prevented him from working because he really did not want to be around people.  (Tr. 53.)

He had been participating in a workers' compensation sponsored vocational rehabilitation

program to learn IT skills since November 2019, and had passed a recent certification exam.  (Tr.

55-56.)  He went to school Monday through Friday, from 8:30 to 4:00.  (Tr. 63.)  He experienced

anxiety at school, but was able to push through it.  (*Id*.)  The school used to have a policy that

students couldn't miss any days, but accommodated him by adopting a policy that students could

miss up to three days.  (*Id*.)  He had missed one day due to anxiety.  (Tr. 64.)

Before he began the vocational training program, he lived with his grandfather.  (Tr. 65.)

They helped each other do what needed to be done, and Mr. White helped specifically with

laundry, cleaning up, and dishes.  (Tr. 65-66.)  He and his grandfather usually ate fast food, but

his grandfather sometimes cooked on the weekends.  (Tr. 65.)  More often, his aunts came over

and cooked for them on the weekends.  (*Id*.)

With regard to his physical impairments, he reported using a cane to help him stand and

walk about 10% to 20% of the time, but noted the cane was not prescribed.  (Tr. 52-53.)  He had

been off medications for his back pain for a month, but previously used oxycodone and Percocet.

(Tr. 59.)  He used a TENS unit for a few hours every day, sometimes even at school.  (Tr. 62.)  About once or twice a month his back pain would interfere with sleeping.  (Tr. 64.)

With regard to his mental impairments, he testified that his stress and anxiety made it hard to focus and get things done.  (Tr. 59.)  His therapy taught him breathing techniques that helped, and he also took Wellbutrin, Trazodone, and hydroxyzine.  (Tr. 60.)  He reported that he used to have racing thoughts, but that got a lot better.  (Tr. 61.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified.  (Tr. 68.)  The VE testified that the hypothetical individual of Mr. White's age, education and work experience and the function limitations described in the ALJ's RFC determination could perform representative positions in the national economy, including machine tender, inspector, and sorter.  (Tr. 70-71.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In his February 28, 2020 decision, the ALJ made the following findings:[2]

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.  (Tr. 21.)

2.  The claimant has not engaged in substantial gainful activity since March 27, 2017, the alleged onset date.  (*Id.*)

3.  The claimant has the following severe impairments: degenerative disc and joint disease of the spine; bilateral carpal tunnel syndrome; a chronic pain disorder; obesity; a bipolar disorder; a depressive disorder; an anxiety disorder; and a posttraumatic stress disorder (PTSD).  (Tr. 22.)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 23.)

5.  The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant would be precluded from climbing ladders, ropes, and scaffolds. He could occasionally stoop and crouch. He could frequently climb ramps and stairs and could frequently balance, kneel, and crawl. Pushing/pulling is limited as per the exertional weight limits. He could frequently handle and occasionally reach overhead (forward and lateral reaching would be unlimited). The claimant could have occasional concentrated exposure to extreme cold, defined as at or below 30 degrees Fahrenheit. The claimant could have occasional concentrated exposure to wetness and irritants such as fumes, odors, dusts, gases, and poor ventilation. He could perform goal based production, where work is measured by the end result, not pace work. The claimant could perform simple, routine, unskilled tasks. He would require a low stress job, defined as having only occasional changes in the work setting with clear expectations. The claimant could interact with the public, coworkers, and supervisors on brief, occasional, superficial basis. The claimant could adapt to settings where the pace is not fast, such as goal-based production.  (Tr. 25.)

6.  The claimant is unable to perform any past relevant work.  (Tr. 39.)

7.  The claimant was born in 1980 and was 36 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id.*)

---

[2] The ALJ's findings are summarized.

8.     The claimant has at least a high school education and is able to communicate in English.  (*Id*.)

9.     Transferability of job skills is not material to the determination of disability.  (*Id*.)

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including machine tender, inspector, and sorter.  (Tr. 39-40)

Based on the foregoing, the ALJ determined that Mr. White had not been under a disability, as defined in the Social Security Act, from March 27, 2017, through the date of the decision on February 28, 2020.  (Tr. 40.)

## V. Plaintiff's Arguments

In his brief, Mr. White asserts that the ALJ made three errors, each requiring remand:

1.  The ALJ failed to evaluate the opinion of Dr. Comianos.  (ECF Doc. 12 p. 15)

2.  The ALJ erred in evaluating the opinion of Dr. Richetta.  (*Id*. at p. 16.)

3.  The ALJ's Residual Functional Capacity analysis does not rely on substantial evidence because he relies extensively on Mr. White's improvement and fails to consider the period that pre-dates said improvement.  (*Id*. at p. 17.)

## VI. Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error.").  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## B.     First Assignment of Error: Whether ALJ Erred in Failing to Evaluate Statement of Treating Doctor Regarding Plaintiff's Ability to Work

Mr. White contends the ALJ erred by failing to assess the persuasiveness of the following statement in Dr. Comianos' April 12, 2017 office notes: "We will continue the work excuse as noted right now as I do not think [Mr. White] is able to work due to his underlying health issues and health problems at this time."  (ECF Doc. 12 pp. 15-16 (citing Tr. 461).)  The Commissioner acknowledges that the ALJ did not analyze the persuasiveness of this statement, but asserts that was appropriate because the statement was not a medical opinion under applicable regulations. (ECF Doc. 13 p. 13 (citing 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2)).)  She further explains that the ALJ was not required to analyze the statement because it only addressed Mr. White's ability to work and was therefore "inherently neither valuable nor persuasive."  (*Id.*)

The applicable regulations required the ALJ to "articulate in …[the] decision how persuasive [he found] all of the <u>medical opinions</u> … in [the] case record."  20 C.F.R. § 404.1520c(b) (emphasis added).  The question is thus whether the statement at issue was a "medical opinion" the ALJ was required to discuss.  A "medical opinion" is "a statement from a medical source about what [the claimant] can still do despite [his] impairment(s) and whether [he has] one or more impairment-related limitations or restrictions" in his ability to perform certain

physical, mental, or other activities, or to adapt to certain environmental conditions.  20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

In contrast, the regulations specify that the ALJ "will not provide any analysis" of certain other evidence that is deemed "inherently neither valuable nor persuasive."  20 C.F.R. §§ 404.1520b(c), 416.920b(c).  Among the evidence considered "neither valuable nor persuasive" are all statements regarding "issues reserved for the Commissioner," which include any statement that a claimant is or is not "disabled, blind, able to work, or able to perform regular or continuing work." 20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i).

The finding Mr. White contends should have been analyzed as an opinion in this case is found in Dr. Comianos' treatment notes for an April 12, 2017 appointment, where he stated:

> David is here for a recheck, followup.  Upper GI showed GERD reflux.  He is seeing a gastroenterologist this week for blood in the stool and GERD.  We will see what he says.  We will continue the Prontix.  History of anxiety over the years.  He used to see Dr. Spare.  We are going to set him back up with either Dr. Spare or Dr. Misra.  I did give him the Vistaril 3 times a day for the itching and anxiety it seemed to work well, so we will continue that.  He knows no driving with that.  Seeing Dr. Prok for his back issues, back problems.  We will continue the work excuse as noted right now I do not think he is able to work due to his underlying health issues and health problems at this time.  He understands the risks and benefits of that.  So we will set these tests up and proceed from there.  Any worsening problems, give us a holler.  Other diagnosed medications and review of symptoms are noted.

(Tr. 461 (emphasis added).)  A review of the underlined language reveals that Dr. Comianos did not offer any opinions as to what Mr. White could do despite his limitations.  He also did not identify "impairment-related limitations or restrictions" regarding his ability to perform any activities or adapt to any environmental conditions.  Thus, the statement was not a medical opinion as defined in the SSA regulations.  *See* 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

Instead, Dr. Comianos stated simply that he would "continue the work excuse" and did not think Mr. White was "able to work … at this time."  (Tr. 461.)  The statement was limited to

an issue "reserved for the Commissioner," i.e., whether Mr. White was "able to perform regular or continuing work." 20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i). Because the regulations explicitly provide that the ALJ "will not provide any analysis" regarding such statements, as they are "inherently neither valuable nor persuasive," the ALJ's decision not to provide an analysis of the statement was appropriate in this case. *See* 20 C.F.R. §§ 404.1520b(c), 416.920b(c).

For all of the reasons stated above, the undersigned finds Mr. White has failed to meet his burden at Step Four to demonstrate that the ALJ erred by failing to "reference" or "consider[] the persuasiveness" of Dr. Comianos' statement that "I do not think [Mr. White] is able to work due to his underlying health issues and health problems at this time." (ECF Doc. 12 p. 16 (citing Tr. 461).) The first assignment of error is without merit.

**C.      Second Assignment of Error: Whether ALJ Erred in Evaluation of Workers' Compensation Opinion of Psychologist Dr. Richetta**

Mr. White also asserts that the ALJ erred in evaluating an Ohio Bureau of Workers' Compensation checkbox form completed by psychologist Dr. Richetta in April 2019. (ECF Doc. 12 pp. 16-17 (citing Tr. 785).) He argues that the ALJ's basis for finding this opinion "generally unpersuasive" was inadequate and amounted to a substantive failure to evaluate the opinion. (*Id.*) The Commissioner responds that the ALJ properly assessed the workers' compensation opinion in keeping with the requirements of the SSA regulations. (ECF Doc. 13 pp. 15-16.)

The form completed by Dr. Richetta was an Ohio Bureau of Workers' Compensation "Physicians Report of Work Ability," where he checked boxes to indicate that Mr. White had temporary restrictions which prevented him from returning to the full duties of his prior job from September 6, 2018 through July 16, 2019. (Tr. 785.) In describing Mr. White's limitations, he

also stated that Mr. White "is psychologically unable to return to work due to depression, reduced motivation, reduced concentration, insomnia; and reduced energy."  (Tr. 785-86.)

The ALJ analyzed the persuasiveness of Dr. Richetta's workers' compensation opinion in combination with similar worker's compensation forms from other providers, explaining:

> The undersigned has read and considered the workers' compensation forms evidenced at Exhibits 11F pages 114-115 and 119-112 and Exhibit 13F pages 23-29.[3]  The forms were completed in connection with the claimant's workers' compensation claim. It should be [sic] the forms contained language and terms specifically unique to workers' compensation. Further, the rules and regulations governing workers' compensation are not synonymous with those governing Social Security. The undersigned finds the forms neither inherently persuasive [n]or valuable. Such findings are not inconsistent with 20 CFR 404.1590b(c)[4] and 416.920b(c). Thus, the undersigned finds the workers' compensation forms generally unpersuasive.

(Tr. 36.)  Mr. White argues that this analysis "is a substantive failure to examine this opinion" because Dr. Richetta's finding that Mr. White "is psychologically unable to return to work due to depression, reduced motivation, reduced concentration, insomnia; and reduced energy" does not relate "in any way to the rules and regulations of workers' compensation."  (ECF Doc. 12 pp. 16-17 (citing Tr. 785).)

As noted in Section VI.B., *supra*, a "medical opinion" is a statement about what a claimant "can still do despite [his] impairment(s)" and whether he has "impairment-related limitations or restrictions."  20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).  In contrast, a statement that a claimant is or is not "disabled, blind, able to work, or able to perform regular or continuing work" is neither valuable nor persuasive.  20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i). "Decisions by other governmental agencies and nongovernmental entities" are also considered neither valuable nor persuasive.  20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1).

---

[3] There are some typographical errors in the citations, which appear to reference Tr. 730-31, 735-36, 783-86.
[4] This appears to be a typographical error, with the appropriate reference being 20 CFR 404.1520b(c).

As an initial matter, the undersigned does not concur with Mr. White that Dr. Richetta's opinion does not "relate[] in any way to the rules and regulations of workers' compensation." (ECF Doc. 12 pp. 16-17.)  His statement that Mr. White was "psychologically unable to return to work" was given in the context of various specific findings that are relevant and applicable only in the workers' compensation context, including findings that Mr. White had "[t]emporary" restrictions relating to "allowed conditions" which prevented him from "return[ing] to the full duties of his[] job held on the date of injury" for a period of time that was notably less than twelve months long.  (Tr. 785.)  The inability to return to full duty in a specific position for a period of less than twelve months clearly has a different significance in a workers' compensation case than it would in a Social Security disability case, as the ALJ's analysis recognized.

More importantly, as in Section VI.B., *supra*, a review of the language highlighted by Mr. White reveals that the specific statement he asserts the ALJ erred in failing to discuss did not constitute a "medical opinion" under SSA regulations.  Dr. Richetta's statement that Mr. White was "psychologically unable to return to work due to depression, reduced motivation, reduced concentration, insomnia; and reduced energy" (Tr. 785) pertained instead to an issue "reserved for the Commissioner," i.e., whether Mr. White was "able to perform regular or continuing work."  20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i).  Because the regulations establish that the ALJ "will not provide any analysis" regarding such statements, which are "inherently neither valuable nor persuasive," the ALJ's failure to specifically address this statement in his analysis of the workers' compensation forms was appropriate.  20 C.F.R. §§ 404.1520b(c), 416.920b(c).

For all of the reasons stated above, the undersigned finds Mr. White has failed to meet his burden at Step Four to demonstrate that the ALJ erred by failing to provide an analysis of Dr.

Richetta's statement that Mr. White was "psychologically unable to return to work."  (ECF Doc. 12 p. 17.)  The second assignment of error is without merit.

**D.     Third Assignment of Error: Whether ALJ's Mental RFC Failed to Account for Evidence of Greater Mental Limitations Prior to Improvement in 2019**

In his final assignment of error, Mr. White asserts that the ALJ's mental RFC lacked substantial evidence in support because the "main support for his finding that Mr. White did not have more significant limitations in his mental health functioning" was evidence of improvement in his mental health in 2019.  (ECF Doc. 12 p. 17 (citing Tr. 32 ("Here, while the claimant experienced mental health conditions and symptoms, the record supports once the claimant was compliant with medication management and therapy, he experienced improvement in his alleged symptomology.").)  While Mr. White agrees that "the record clearly documents improvement in his mental health condition in early to mid-2019," he contends that such improvement "leaves an approximate 2 year period (spring 2017 to spring 2019) unconsidered by the ALJ."  (*Id.* at p. 18.)  Because the finding of improvement in 2019 "necessarily implies that Mr. White's mental health functioning was more limited leading up to this date," Mr. White contends "[a] close reading of his decision indicates he has effectively only rendered a[n RFC] finding for the time period post-dating the improvement."  (*Id.*)  The Commissioner responds that the ALJ clearly considered the pre-2019 evidence, as referenced and discussed it in the decision, and accommodated the full range of Mr. White's mental impairments in the RFC determination.  (ECF Doc. 13 pp. 17-18.)

While the substantial evidence standard is deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety."  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Human Servs*., 736 F.2d 365, 366 (6th Cir. 1984)).  The *Rogers* court explained: "This requirement that determinations be made in light of

29

the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history." *Rogers*, 486 F.3d at 249.

A review of the ALJ's detailed and thorough findings does not substantiate Mr. White's assertion that the ALJ "effectively only rendered a[n RFC] finding for … early 2019 through the date of the [ALJ] decision."  (ECF Doc. 12 p. 18.)  With regard to his RFC findings at Step Four, the ALJ provided the following discussion of Mr. White's mental health treatment from 2016 through 2018, prior to any reported improvement in 2019:

> In addition to physical conditions, the claimant was diagnosed with a combination of mental health conditions, including a bipolar disorder, depressive disorder, anxiety disorder, and PTSD. Treatment notes prior to the alleged onset date, when the claimant was working, during 2016, supported reports the claimant was nervous and anxious; however, during that time he was noted to have normal behavior and thought content and was also alert and oriented (Exhibit 3F/17-27). A month prior to the alleged onset date, in February 2017, the claimant was reported as anxious and nervous, but he demonstrated normal behavior, judgment, and thought content (Exhibit 3F/32). During March 2017, the claimant showed normal mood and affect as well as normal behavior (Exhibit 4F/4). In April 2017, the claimant sought treatment for GI related symptoms and reported panic attacks (Exhibit 1F/12). The claimant reported increased panic and anxiety related to stress (Exhibit 1F/12). The claimant reported he had been offered medication by his doctor but declined the medication; however, he reported he felt the symptoms were increasing (Exhibit 1F/12). The claimant was given Vistaril medication (Exhibit 4F/16). The claimant was observed to be agitated, but there was no evidence of behavioral problems (Exhibit 4F/17(. In July 2017, the claimant was noted to have bipolar disorder and generalized anxiety and it was recommended he take melatonin and Wellbutrin, as well as Vistaril and Seroquel (Exhibit 4F/22-23). The claimant underwent a psychological assessment in July (Exhibit 4F/24). He was observed to be guarded and reported panic attacks (Exhibit 4F/24). The claimant was preoccupied with his prior employment history and he endorsed sleep problems (Exhibit 4F/24). The claimant admitted that he was noncompliant with prior treatment he had received, including medications that were prescribed (Exhibit 4F/24). The claimant reported impulsive behavior, crying, and issues with sleep and motivation (Exhibit 4F/25). The claimant reported decreased concentration (Exhibit 4F/26). He was observed to have pressured speech and loose associations, with constructed mood, blunted affect, limited judgment, intact memory, and impaired concentration/attention (Exhibit 4F/26). However, he showed no suicidal or homicidal ideation (Exhibit 4F/26). The claimant was told to continue prescribed medications (Exhibit 4F/27). During August treatment notes supported he was nervous and anxious, but he showed normal behavior, judgment, and thought content (Exhibit 3F/47). Mental

health treatment notes in August 2017, noted the claimant reported high anxiety (Exhibit 4F/33). The claimant reported he felt the medications he was prescribed did not work and specifically requested benzodiazepine medication (Exhibit 4F/33). However, he was denied the specifically requested medication, noting they do not work well with his prescribed pain medication, Percocet (Exhibit 4F/33). The claimant reported he was noncompliant with the medications that were prescribed at his prior July appointment (Exhibit 4F/33). Despite his noted noncompliance, it was recommended the claimant take trazodone medication for reported sleep issues (Exhibit 4F/33-34). The claimant was described as defensive, with pressured speech, and having disorganized thoughts (Exhibit 4F/35). He was depressed and anxious, with blunted affect, and had impairment to his memory and attention, but he showed no suicidal or homicidal ideation (Exhibit 4F/35-36). During September 2017, the claimant did not appear anxious or nervous during his physical appointment (Exhibit 3F/52). IN October 2017, the claimant reported that he was occasionally irritable and had anxiety (Exhibit 4F/48). He demonstrated pressured speech but had no evidence of suicidal or homicidal ideation (Exhibit 4F/52). The claimant was alert and oriented, but there was impairment to his memory, attention, and concentration (Exhibit 4F/52). During his December 2017 physical appointment, he was noted to be alert and oriented with normal behavior, thought content, and judgment (Exhibit 3F/58). During his mental health appointment, he was described as liable and agitated, admitting he wanted to hurt people (Exhibit 4F/64). He reported issues related to his prior employer, feeling they gave him a hard time (Exhibit 4F/64). The claimant was defensive, showed retarded and involuntary movements, exhibited pressured speech, but maintained intact memory (Exhibit 4F/67). He was depressed and anxious, but remained alert and oriented (Exhibit 4F/67).

During February 2018, the claimant was in a manic phase, evidencing impulsivity (Exhibit 4F/82). The claimant reported anger because his family was not supporting him (Exhibit 4F/82). During March 2018, the claimant reported that he had anger that would build up and that he had lost his girlfriend to such symptoms (Exhibit 5F/1). The claimant continued to report preoccupation with his employment problems (Exhibit 5F/2). He was depressed, but noted he continued to exercise and use the hot tub at the Y (Exhibit 5F/3). During April 2018, the claimant reported that cold weather was exacerbating his pain and he was trying to do with as little medications as possible (Exhibit 4F/98). During May 2018, the claimant reported he had participated in career counseling, but noted it had ended (Exhibit 7F/1). He reported he did not like the positions offered and the record noted the claimant may not want to engage in work (Exhibit 7F/1). During June 2018, the claimant reported generalized anxiety, but admitted he had not been as anxious as he was in the past (Exhibit 7F/2). He was handling anxiety better than he had before (Exhibit 7F/2). Also during June 2018, the claimant was observed to be depressed with constricted affect, reporting financial stressors (Exhibit 8F/2). The claimant reported that small things make him angry and he was going to Hocking Hills for a few days to visit his sister (Exhibit 8F/2). The claimant was not taking medications as prescribed (Exhibit 8F/2). However, he admitted at that time that he should restart his medications (Exhibit 8F/2). During July 2018, at his physical examination, he was

> noted to be alert, showed appropriate eye contact, and demonstrated normal memory, concentration, speech, and mood (Exhibit 6F/3). Also during July, the claimant was cited as having a negative perspective (Exhibit 7F/4). In August 2018, he was noted to be doing well (Exhibit 8F/18). <u>During October 2018, the claimant admitted the addition of Depakote medication was making a difference</u> (Exhibit 14F/47).

(Tr. 30-33 (emphasis added).)

In arguing that the mental RFC was assigned without consideration of his pre-2019 mental health treatment records, Mr. White cites to various treatment notes from Dr. Misra that reflected abnormal mental status examinations. (ECF Doc. 12 pp. 18-19.) But a side-by-side comparison of Mr. White's citations and those set for the in the ALJ analysis above reflects that the ALJ specifically discussed much of the same evidence. (*Compare id.* at p. 19 (citing Tr. 469, 478-79, 491, 510-11, 527, 543, 581, 836, 846) *with* Tr. 31-32 (citing Tr. 469, 478-79, 491, 510, 541, 578, 833).) Certainly, the ALJ acknowledged symptomatic mental status findings during that time period which included depression, anxiety, nervousness, guarded behavior, pressured speech, loose associations, blunted or constricted affect, limited judgment, impaired concentration, attention, and/or memory, defensiveness, disorganized thoughts, liable and agitated behavior, admitted desire to hurt people, retarded and involuntary movements, impulsivity, and a negative perspective. (Tr. 30-32 (citing records).)

In addition to acknowledging the symptomatic examination findings highlighted by Mr. White, the ALJ noted numerous occasions when Mr. White was not fully compliant with treatment recommendations even though he benefited when compliant. As noted in the underlined sections above, the ALJ specifically noted that Mr. White had declined anxiety medication from his primary care provider in advance of his April 2017 ED visit for nausea and anxiety (Tr. 30 (citing Tr. 331)), admitted noncompliance with prior medications at his July 2017 psychological evaluation (Tr. 31 (citing Tr. 467)), reported noncompliance with medications

prescribed in July 2017 when he returned in August 2017 (*id.* (citing Tr. 476)), reported in April

2018 that he was trying to do with as little medications as possible (*id.* (citing Tr. 541)), was not

taking his prescribed mental health medications in June 2018, and admitted that he should restart

the medications (Tr. 32 (citing Tr. 578)), and admitted in October 2018 that the addition of

Depakote was making a difference (*id.* (citing Tr. 833)).  Notably, the subsequent discussion of

treatment records in 2019 and 2020 repeatedly noted that the records reflected Mr. White was

"stable on his current medications" and taking his medications as prescribed.  (*Id.* (citing Tr. 791,

793, 804, 818).)

> Following his discussion of the mental health treatment records, the ALJ concluded:
>
> [W]hile the claimant experienced mental health conditions and symptoms, the record supports once the claimant was compliant with medication management and therapy, he experienced improvement in his alleged symptomology. While he continued to report some issues with focus, the record supports he was capable of passing collegiate level courses to obtain certification in networking (Testimony). The claimant admitted he was attending school all day, which requires sustained attention and concentration. Further, it should be noted the claimant living out of a hotel, to attend school only going home on the weekends. The record was devoid of any mental symptom exacerbations or deterioration during this period of time and the claimant did not testify he had issues attending classes or performing well in school due to breakthrough mental health symptoms.

(Tr. 32-33 (emphasis added).)  In the context of the ALJ's thorough discussion of the treatment

records from 2016 through 2020, it is apparent that the underlined language above was not a

finding – as Mr. White contends – that "more significant mental health limitations are not

included in the [RFC] because of improvement that occurred in early 2019." (ECF Doc. 12 p.

18.)  Instead, the ALJ was highlighting the fact that the earlier periods of more significant

symptomatology appeared to coincide with instances of noncompliance with treatment

recommendations, while Mr. White experienced improvement in alleged symptomatology when

he was compliant with medication management and therapy.  (Tr. 32.)

In addition to highlighting the apparent positive impact of compliance with mental health treatment recommendations, the ALJ also considered and highlighted subjective evidence that was inconsistent with Mr. White's asserted level of limitation (Tr. 34), Mr. White's consumption of alcohol and marijuana (*id.*), evidence of inconsistent statements by Mr. White (Tr. 35), further documentation of non-compliance with treatment recommendations (*id.*), and the medical opinions of Dr. Shuman and the state agency psychological reviewers (Tr. 37-38). Mr. White has not challenged the ALJ's findings with respect to any of these considerations.

It is also noted that the mental RFC limitations applied by the ALJ do not appear consistent with Mr. White's increased level of mental functioning following his improvements in 2019, when he was reportedly capable of passing collegiate level courses, able to move out of his grandfather's home and live out of a hotel, and able to spend weekdays among strangers in an unfamiliar academic environment. (Tr. 32-33.) Instead, the RFC limited him to "simple, routine, unskilled tasks" with "only occasional changes in the work setting" and "interact[ion] with the public, coworkers, and supervisors on brief, occasional, superficial basis." (Tr. 25, 33.) These significant RFC limitations appear more consistent with a greater level of limitation than that reportedly demonstrated by Mr. White beginning in 2019.

A complete review of the ALJ decision and the underlying record support a finding that the ALJ's mental RFC determination was supported by substantial evidence. The undersigned is accordingly obligated to recognize "'that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545). Thus, regardless of whether the same evidence could be interpreted to support a finding that Mr. White had more restrictive mental functional limitations,

the ALJ's decision must be upheld because "substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakely*, 581 F.3d at 406.

For the reasons set forth herein, the undersigned finds Mr. White has not met his burden to demonstrate at Step Four that the ALJ lacked substantial evidence to support his mental RFC determination.  Mr. White's third assignment of error is without merit.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be AFFIRMED.


                                             */s/Amanda M. Knapp*

June 1, 2022

                                             AMANDA M. KNAPP
                                             United States Magistrate Judge


## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).